# COURT OF ERRORS AND APPEALS.

JUNE TERM, 1858.

Between THE MORRIS CANAL AND BANKING COMPANY, appellants, and GEORGE T. LEWIS, respondent.

The coupon bonds of an incorporated company are transferable by delivery, so that a *bona fide* holder has a good title to them. It rests upon the faith that such bonds are expressly designed to be thus circulated, and to be sold in the stock market like public securities, and that they are universally so used.

When bonds of such a character, having several years to run before they become due, are deposited as collateral security for the payment of promissory notes soon to mature, the fair presumption is that they were designed to be held as a pledge, and were expected to be sold, after demand and due notice, like goods, chattels, stocks, and public securities, in case the debt for which they were pledged should not be punctually paid. Such a deposit differs entirely from a deposit of ordinary bonds, mortgages, promissory notes, and like choses in action, which, in the absence of an agreement to that effect, the creditor cannot expose to sale, because they have no market value, and it cannot be presumed it was the intention of the parties thus to deal with them.

When a person has tacitly encouraged the act being done, or has consented to it, he shall not exercise his legal right in opposition to that consent.

This cause was argued in the Court of Chancery by

*W. L. Dayton*, *Att'y Gen.*, for Lewis, the complainant.

*F. T. Frelinghuysen* and *J. P. Bradley*, for defendants.

A decree was made in favor of the complainants, from which the defendants appealed. The state of the case and the questions involved sufficiently appear in the opinion of the Chancellor, which he furnished the court, as containing the reasons for his decree.

WILLIAMSON, C. By their charter, the Morris Canal and Banking Company are authorized to borrow money, and

in order to secure its payment, with interest, to mortgage the chartered rights of the company, its canal, appendages, &c. The company executed a mortgage to trustees to secure such bonds as they might issue for the purposes of a loan. On the 22d of February, 1848, they were indebted to I. P. Morris and Co. on two promissory notes, amounting together to the sum of $2714.56. One of the notes fell due on the 18th of June, 1848, and the other on the 18th of July of the same year. On the 22d of February, the company deposited with the said I. P. Morris & Co. six bonds, of $500 each, and twenty bonds, of $100 each, secured by the mortgage aforesaid, as collateral security for the payment of the said two promissory notes.

The notes not having been paid at maturity, on the 15th of August, 1848, the said I. P. Morris and Co. advertised and sold the bonds at public auction, and realized on said sale the sum of $1626. They afterwards recovered of the company $1335.91, the balance due on the promissory notes. The complainant is the holder of the bonds. He claims the whole amount of principal and interest due upon the face of the bonds, and has brought this suit to obtain the benefit of the mortgage security.

By a reference to the case of *The Morris Canal and Banking Company* v. *Fisher*, as reported in 1 *Stockton's Ch. Rep.* 667, it will be seen that there is no difference in the general features of that case and the one we are considering. There a debt was due from the company to one *Lewis*, and bonds, in amount double of the debt, were deposited as collateral. *Fisher* became the purchaser of the bonds at a public sale. He filed his bill against the company, claiming the full amount of the bonds and benefit of the mortgage security. That case was referred to a master, not, however, for the reason stated in the case, that the Chancellor had been of counsel in reference to the matters in controversy, but for other reasons, which were removed when the present case was argued. The master advised

a decree in favor of the complainant.   The case was carried to the Court of Errors and Appeals, and affirmed there.   In deciding the present case, I shall observe the same caution which characterizes the opinion of the Court of Appeals, as delivered by Mr. *Justice Elmer*, and shall express no opinion upon any principles introduced into the argument of the cause, except upon such only as are necessary to be decided in order to terminate the present controversy.

In the case referred to, Samuel F. Fisher was shown to be a *bona fide* holder of the bonds of the company, and, as stated by Mr. *Justice Elmer*, the question upon which the case turned was, whether the honest acquisition of the bonds, without notice of any defect in the title of the seller, if a defect there was, conferred on him a title similar to that acquired by a *bona fide* holder of money, bills of exchange, and promissory notes payable to bearer. He declared it as the opinion of the court, that the bonds in question were " transferable by delivery, so as to confer a complete title in the possessor, not as instruments negotiable under the law of merchants, as bills and notes are, but as instruments of a peculiar character, expressly designed to be passed from hand to hand, and by a common usage, known to all, actually so transferred."

The very important question, which was elaborately argued in the case of *Fisher* as well as in the argument of this case, whether, *as between the company and the individual with whom the bonds were deposited*, the latter had a right to sell the bonds, unless there was a special contract to that effect, the Court of Appeals did not decide.   The bonds having been made for the purpose of being transferable by delivery, and expressly designed to be passed from hand to hand, if the holder made an improper disposition of them, the company could not avail themselves of such a defence against a recovery on the bonds in the hands of a *bona fide* purchaser any more than they could against a recovery upon a bill of exchange or promissory

note put in circulation under like circumstances. I am bound by the decision, and in my judgment it is correct. It was therefore unnecessary to determine in that case whether *Lewis* had a right to sell the bonds. As *Fisher* was a *bona fide* purchaser, in the opinion of the court, he was entitled to recover upon the bonds, whether *Lewis*, as between himself and the company, had the right to sell them, or had not that right. I shall, in deciding the the present case, adhere to the case of *Fisher*, as it was decided in the Court of Appeals.

I should be very unwilling to have this court to be the first in New Jersey to make the decision, that where bonds, mortgages, promissory notes, and like choses in action are placed in the hands of a debtor to secure the payment of a promissory note, that the creditor, if the note should not be paid at maturity, may sell the collaterals in open market to pay the note. I can see no legal objection to a debtor and creditor making *an agreement* to that effect; but unless such special agreement is made, I do not believe that it is the law of New Jersey that the creditor can claim any such right. I think I may safely affirm that such has never been the understanding in the business community, where it is very common to make deposits of collaterals. In our banks, nothing is more common than for an individual to deposit additional security for notes which he offers for discount. But I should doubt whether it has ever been understood that such collaterals could be disposed of by sale. It has not been the usage. Such has never been declared to be the law in New Jersey, and I can see no reason why it should be so declared, since it is so easy for parties to make a special agreement to that effect, if they see proper to depart from the common usage.

It is, too, a very serious question, whether directors, under a charter which authorizes them to raise money by giving the bonds of the company, and securing them by a mortgage on their work or charter privileges, &c., have

the right to deposit such bonds as collateral for debts, and in default of paying such debts, agree that the bonds shall be sold for what they may bring in market. Such an arrangement is a great wrong, amounting to a fraud upon other bondholders. In this case the company made a mortgage for $250,000, to secure bonds issued to that amount. A part of this loan was subscribed for, and the money paid, and bonds issued to the subscribers. They paid their money upon the faith, that whatever money was raised upon that mortgage should be expended in improving the canal. If it had been so expended, the mortgage security would have been thereby enhanced. But if the directors could use the remaining bonds for a purpose not authorized by the charter, and instead of raising money upon them at their par value, could deposit them as collaterals, to be sold afterwards at a discount of seventy-five per cent., the security of the bonds of the *bona fide* subscribers to the loan would be thereby greatly depreciated. Such a use of the bonds, it appears to me, is a breach of trust on the part of the directors, and a purchaser of such bonds, *with full knowledge of the transaction,* would not be a *bona fide* purchaser. Nor do I think that a board of directors is authorized to pledge their stock for such a purpose. The stockholders ought to have some protection against such an improper use of the securities and stock of the company by the directors. An innocent purchaser of such securities or stock ought to be protected, but not one who participates in the wrong.

I cannot see that the present case differs in any respect from that of *The Morris Canal and Banking Company* v. *Fisher.* It was attempted to show that Lewis was not a *bona fide* holder, that is, that he purchased these bonds with a full knowledge of the transaction, as it existed between the company and I. P. Morris & Co. Had the defendants been successful in establishing this fact, then it would have been necessary to decide as to the respective rights and duties existing between the original parties.

After a careful examination of the evidence, I do not think the defendants have been successful in establishing the fact, that when Lewis made the purchase he knew of the transaction. There is some evidence, and the suspicion is very strong, that he did; but there is no proof upon which the court can with any propriety rely. The bonds were struck off at the sale to Robert Adams, and he afterwards transferred his bid to I. P. Morris and Co. There is no evidence from whom the complainant purchased them. All the testimony on this point is from Ephraim Marsh, the president of the company. I will give what he says upon this point in his own language: "I am acquainted with Mr. George Lewis, the complainant; think I have had conversation with him as to these bonds, and from that conversation I understood that George Lewis knew at the time he became holder of these bonds that they had been deposited with I. P. Morris and Co. as collateral. We talked this matter all over. Mr. Lewis said he knew what the note was given for, and that the bonds were left as collateral security for the payment of two notes, which notes, I stated to him, were for a past debt."

Laying out of view the consideration of the position which the witness occupies as to the transaction, and that he speaks of a conversation which he only thinks he had with the complainants, the extent of the evidence is, that Lewis knew at the time he purchased the bonds that they had been originally left as collateral. It is not enough that he had knowledge at the time he purchased the bonds. The bonds had been previously sold to Robert Adams, and there is no evidence that *he* is not a *bona fide* purchaser. If Lewis purchased them from a *bona fide* purchaser, it matters not whether he knew at the time of his purchase of the original transaction or not. When they came into the hands of a *bona fide* purchaser, they were relieved from all equities existing between the original parties. In case of a mortgage security, if one, who is a *bona fide* purchaser

without notice of a prior unregistered mortgage, sells to another who had notice, the latter will be protected in his purchase, for otherwise such *bona fide* purchaser would not enjoy the full benefit of his own unexceptionable title. This is a familiar principle, and so well settled that there is no need of citing authorities to support it. I think the complainant brings himself within the principles of the case of *Fisher*, as decided in the Court of Appeals, and that he is entitled to a decree.

The cause was argued on appeal by

*F. T. Frelinghuysen* and *J. P. Bradley*, for appellants.

*W. L. Dayton* and *A. O. Zabriskie*, for respondents.

The opinion of the court was delivered by

ELMER, J. It was held by this court, in the case of *The Morris Canal and Banking Company* v. *Fisher*, 1 *Stock.* 667, that the coupon bonds of the company are transferable by delivery, so that a *bona fide* holder has a good title to them, and this principle has since been recognised as correct by other courts. It rests upon the faith that such bonds are expressly designed to be thus circulated, and to be sold in the stock market like public securities, and that they are universally so used. When bonds of such a character, having several years to run before they become due, are deposited as collateral security for the payment of promissory notes soon to mature, the fair presumption is that they were designed to be held as a pledge, and were expected to be sold, after demand and due notice, like goods, chattels, stocks, and public securities, in case the debt for which they were pledged should not be punctually paid. Such a deposit differs entirely from a deposit of ordinary bonds, mortgages, promissory notes, and like choses in action, which, in the absence of an agreement to that effect, the creditor cannot expose to sale, because they have no market value, and it cannot be presumed it

2 E*

was the intention of the parties thus to deal with them. The reasoning of the judge who delivered the opinion in the case of *Wheeler* v. *Newbould*, 5 *Duer* 29, goes to this extent, although the case itself decides only that a sale of pledged property, to be valid, must be public, and be preceded by a demand of payment and a reasonable notice of the time and place of sale.

The bonds now in question were deposited by the appellants as collaterals for the payment of two notes of theirs, given to I. P. Morris & Co., of Philadelphia. Besides the presumption arising from the nature of the deposit, the correspondence between these parties, we think, establishes beyond all reasonable doubt that they expected them to be sold to raise the money, if the notes were not paid when they became due.

A few days prior to June 15th, 1848, when the first note came due, the president of the company writes to Morris & Co. asking further time, and suggesting that an extension would probably be desired on the other note falling due July 15th. To this Morris & Co. replied, "we propose to place these bonds in the hands of a broker, with directions to sell a sufficient amount to cover the amount of note and expenses, of which course we presume the company can have no reasonable objection to offer. We shall, however, await a return of mail before we take any action upon it." The president replied, "we cannot, I believe, offer a reasonable objection to the course you propose to pursue in reference to the bonds left with you as security for the payment of your note against this company; and then requests them to defer further proceedings until after a meeting of the board of directors, soon to be held. To this Morris and Co. acceded. On the 28th of June, at the close of the meeting of the board, the president writes, stating that the board had fully considered the position of the business, and requesting further delay. July 19th, Morris and Co. write, noticing the protest of the second note, and say, "we propose to wait

your answer by return mail, if any you have; and if we do not hear from you, we then propose to advertise them, and expose them to public sale to the highest bidder; or if you have any other mode to suggest, we shall be pleased to have your views." July 22d, the president answers, " I have only to suggest that a further delay of the resort to a sale of bonds might be much more agreeable, and I trust more advantageous to your company. You will, however, decide upon your own course, while I have only to repeat, that no effort shall be wanting on our part to meet yours and all other claims upon us." August 11th, Morris & Co. write, " Fearing that you may not be apprized that we have felt called upon to dispose of the bonds of the Morris Canal and Banking Company, which we hold as collateral security for the claim we have on the company, we have therefore to inform you that they will be sold on the 15th instant by public sale, at the exchange in this city, to the highest bidder; and if we do not realize from them sufficient to pay our claim, we shall then look to the company for any deficiency that may arise from the transaction. Please to receive annexed a copy of M. Thomas & Sons' advertisement in the U. S. Gazette of this city."

The president, who was examined as a witness for the appellants, says he wrote the letter of the 22d of June, and that he did not mean to admit there the rights of the holder of said bonds to sell them; that he could not object to their doing so at their peril. He testifies that Mr. Lewis told him, after the bonds were sold, that he had a right to those bonds on account of the statement, in letters of Judge Marsh (the president) to I. P. Morris and Co., and that his impression is, he said he would not have bought them, except for those letters. He also says that his impression is he wrote to I. P. Morris & Co. that they had no right to sell those bonds. When he thinks he so wrote is not stated. No such letter is produced, nor was any attempt made to prove, by the examination of Mor-

ris or otherwise, that such a letter was received. This vague impression is therefore entitled to no weight; and the case must be decided upon the supposition that no such letter was written before the sale. As to the statement, that he did not mean, by the letter of June 22d, to admit the right of the holder to sell the bonds, it was hardly insisted that it is entitled to any influence. Whatever may have been his personal views, or the real intentions of the board of directors, the correspondence will admit of but one meaning. Morris and Co. and the respondent must have understood them as intimating that they had no objection to make to the proposed sale. To permit them now to complain that they did not so intend, would be to permit them to take advantage of their own silence when they were bound to speak. In *Batten on Sp. Per.* 88 (7 *Law Lib.* 69), the author states the principle to be deduced from the authorities in equity to be, " when a person has tacitly encouraged the act being done, or has consented to it, he shall not exercise his legal right in opposition to that consent." Upon this just principle, if it was admitted, that when the bonds were deposited, it was not intended that they should be sold, the company would be *estopped* by the correspondence from withdrawing their consent after the sale had taken place.

Robert Adams, to whom the bonds were publicly bid off and sold at the exchange, transferred his bid, on the next day, to I. P. Morris & Co., who then became the absolute owners of them, and credited the amount they produced on the notes held by them. There is no proof that Adams purchased them for Morris & Co., or otherwise than in a fair and *bona fide* manner. It is therefore not necessary to determine whether Morris & Co. had a right to purchase at a sale made by their own order and for their own benefit. The title of Adams, although not so perfected as to enable him to take possession of the bonds until he paid for them, was the title of a *bona fide* purchaser, which he had a right to transfer to any subse-

quent purchaser, who thus took his place as a *bona fide* holder. It does not distinctly appear of whom the respondent purchased the bonds; but as it does appear that Morris & Co. had acquired a perfect title to them, it is no defence if he purchased of them, and as the appellants insist, after he was notified that they objected to the sale. The decree of the Chancellor must be affirmed with costs.

The decree of the Chancellor was affirmed by the following vote:

*For affirmance*—CHIEF JUSTICE, Judges OGDEN, HAINES, RYERSON, VREDENBURGH, CORNELISON, SWAIN, WOOD, RISLEY.